572 F.2d 1010
 Eddie Mitchell TASBY and Phillip Wayne Tasby, by their
parent and next friend,
Sam Tasby, et al., Plaintiffs-Appellants Cross Appellees,
Metropolitan Branches of the Dallas N. A. A. C.
P., Plaintiffs-Intervenors
Appellants-Cross Appellees,
v.
Dr. Nolan ESTES et al., Defendants-Appellees Cross Appellants.
Eddie Mitchell TASBY and Phillip Wayne Tasby, by their
parent and next friend, Sam Tasby, et al., Plaintiffs,
Metropolitan Branches of the Dallas N. A. A. C. P., et al.,
Plaintiffs-Intervenors, Appellants,
v.
Dr. Nolan ESTES et al., Defendants-Appellees.
CONCERNED CITIZENS OF GLENVIEW, Plaintiff-Appellant,
v.
Dr. Nolan ESTES, General Superintendent, et al., Defendants-Appellees.
 Nos. 76-1849, 77-1752 and 77-2335.
 United States Court of Appeals,
Fifth Circuit.
 April 21, 1978.
Rehearings and Rehearing En Banc Denied May 23, 1978.
 
 Edward B. Cloutman, III, Dallas, Tex., Melvyn Leventhal, Jackson, Miss., Vilma S. Martinez, Mexican American Legal Defense & Educational Fund, Inc., San Francisco, Cal., Albert H. Kauffman, San Antonio, Tex., Tri-Ethnic Committee, Dallas, Tex., for plaintiffs-appellants cross appellees in 76-1849 and for Tasby, et al. in 77-1752.
 Sylvia M. Demarest, Dallas, Tex., for plaintiffs-appellants cross appellees in 76-1849.
 E. Brice Cunningham, L. A. Bedford, Jr., Dallas, Tex., for Metropolitan Branches of Dallas, N.A.A.C.P. in 76-1849 and 77-1752.
 Warren Whitham, Dallas, Tex., for Estes, et al. in 76-1849, 77-1752 and 77-2335.
 Mark Martin, Dallas, Tex., for Estes, et al. in 76-1849 and 77-1752.
 Earl Luna, Dallas, Tex., for Carrollton-Farmers Branch.
 James W. Deatherage, Irving, Tex., and Benjamin L. Craig, Denver, Colo., for Irving ISD.
 Robert J. Caraway, Dallas, Tex., for Wilmer-Hutchins.
 Richard E. Gray, Dallas, Tex., for Highland Park in 76-1849 and 77-1752.
 H. Louis Nichols, Dallas, Tex., for Duncanville.
 Robert H. Mow, Robert L. Blumenthal, Dallas, Tex., for Curry, et al. in 76-1849 and 77-1752.
 James A. Donohoe, G. Duffield Smith, Dallas, Tex., for Brinegar, et al. in 76-1849 and 77-1752.
 N. Alex Bickley, City Atty., Dallas, Tex., for City of Dallas.
 James T. Maxwell, pro se.
 Martin Frost, John W. Bryant, Dallas, Tex., for Strom, et al. in 76-1849 and 77-1752.
 James G. Vetter, Jr., Dallas, Tex., for Citizens of Oak Cliff in 76-1849 and 77-1752.
 H. Ron White, Walter L. Irvin, Daniel Solis, Dallas, Tex., amicus curiae, for defendants-appellees cross appellants in 76-1849 and for other interested parties in 77-1752.
 Nathaniel R. Jones, Charles Carter, New York City, for plaintiffs-intervenors, appellants in 77-1752.
 Thomas E. Ashton, III, Dallas Legal Serv. Foundation, Inc., Dallas, Tex., for Tasby, et al. in 77-1752.
 Lee Holt, City Atty., Dallas, Tex., for City of Dallas.
 George Solares, Dallas, Tex., for plaintiff-appellant in 77-2335.
 Appeals from the United States District Court for the Northern District of Texas.
 Before COLEMAN, TJOFLAT, and FAY, Circuit Judges.
 TJOFLAT, Circuit Judge:
 
 
 1
 The Dallas Independent School District (DISD), the eighth largest urban school district in the country, has been the subject of desegregation litigation for over twenty years.[1] In 1975, a panel of this court remanded the case to the district court with instructions that a plan be implemented that would effectively desegregate the school system. Tasby v. Estes, 517 F.2d 92 (5th Cir.), cert. denied, 423 U.S. 939, 96 S.Ct. 299, 46 L.Ed.2d 271 (1975). On remand, a new school desegregation plan was adopted by the district court. Tasby v. Estes, 412 F.Supp. 1192 (N.D.Tex.1976). In these consolidated appeals, the NAACP, intervenors in the desegregation case[2], primarily challenge the student assignment portion of the district court's order; this will be referred to as the main appeal. The NAACP claims that the student assignment plan cannot pass constitutional muster because of the large number of one-race schools it establishes. The plan divides the DISD into six subdistricts, one of which is nearly all black and contains only one-race schools.[3] In the other five subdistricts, containing some 160 schools, approximately fifty are still essentially one-race schools. Two other matters concerning the DISD are also before this court: the exclusion of the Highland Park Independent School District from the district court's desegregation plan[4] and the acquisition and sale of certain school sites by the DISD.[5]
 
 I. The Main Appeal
 
 2
 A detailed description of the proceedings in this complex litigation prior to 1975 can be found in the opinion of the previous panel, which is reported at 517 F.2d 92 (5th Cir.), cert. denied, 423 U.S. 939, 96 S.Ct. 299, 46 L.Ed.2d 271 (1975). That panel disapproved the district court's 1971 plan, which sought to eliminate the vestiges of a dual school system in the DISD, and remanded the case for the formulation of a more effective student assignment plan.
 
 
 3
 Since 1971, substantial changes have occurred in the DISD. The residential patterns of Dallas have shifted; many areas are now naturally integrated. What was formerly a majority Anglo system has become a predominantly minority one, although the population of the city of Dallas remains majority Anglo.[6] As the district court recognized in fashioning the plan now before us, there may be special considerations involved in devising a school desegregation plan in an urban area with a predominantly minority enrollment that may justify the maintenance of some one-race schools. 412 F.Supp. at 1195-1199. See Calhoun v. Cook, 522 F.2d 717 (5th Cir.), rehearing denied, 525 F.2d 1203 (5th Cir. 1975) (discussing similar developments in Atlanta, Georgia).
 
 
 4
 In devising its plan, the district court considered numerous proposals to desegregate the school system. Plans were submitted by the original plaintiffs; the NAACP; the DISD; Dr. Joseph A. Hall, a court-appointed expert; and the Education Task Force of the Dallas Alliance, a triethnic group and amicus curiae in this suit.[7] After developing a voluminous record and holding hearings for over a month on the feasibility and effectiveness of these proposals, the district judge drew a comprehensive plan dealing, inter alia, with special programs, transportation, discipline, facilities, personnel, and an accountability system, as well as student assignments. 412 F.Supp. at 1195, 1212-21. We find it necessary to remand again the student assignment portion of the plan for further consideration. On remand, the district court should reconsider the other provisions of its plan in the light of the relief it ultimately orders.[8]
 
 
 5
 The order under review calls for the creation of six subdistricts, generally reflecting the geographical sections of the DISD, for student assignment purposes. Four of these subdistricts, Southwest, Northwest, Northeast, and Southeast, have approximately the racial makeup, plus or minus five percent, of the DISD as a whole. The other two subdistricts each contain a predominant ethnic group. Seagoville, geographically isolated from the rest of the DISD, has an approximately eighty-two percent Anglo enrollment and is the only predominantly Anglo subdistrict. East Oak Cliff, bounded by the Trinity River bottom on one side and by Interstate 35 on the other, is approximately ninety-eight percent black.
 
 
 6
 The district court order provides for uniform grade configurations throughout the DISD: kindergarten through third grades (K-3) Early Childhood Education Centers, fourth through sixth grades (4-6) Intermediate Schools, seventh and eighth grades (7-8) Middle Schools, and ninth through twelfth grades (9-12) High Schools.[9] Wherever possible, present student assignments are retained in "naturally integrated" areas. Students in the K-3 Early Childhood Education Centers remain in their neighborhood schools.[10] In the areas that are not naturally integrated, students in grades 4-8, the Intermediate and Middle Schools, are assigned to centrally located schools. High school students are assigned to their traditional neighborhood schools.
 
 
 7
 Various programs to increase the desegregation of the DISD's schools are to be implemented. Majority-to-minority transfers are permitted at all grade levels.[11] Present magnet high schools and magnet comprehensive high schools[12] are to be maintained and new ones are to be established. The goal is the institution of magnet 9-12 schools throughout the DISD. 412 F.Supp. at 1205.
 
 
 8
 The DISD acknowledges that the creation of the all black East Oak Cliff subdistrict and the existence of a substantial number of one-race schools militate against the finding of a unitary school system. It contends, however, that this is the only feasible plan in light of natural boundaries and "white flight." The district court was instructed in the opinion of the prior panel to consider the techniques for desegregation approved by the Supreme Court in Swann v. Charlotte-Mecklenburg Board of Education, 402 U.S. 1, 91 S.Ct. 1267, 28 L.Ed.2d 554 (1971). We cannot properly review any student assignment plan that leaves many schools in a system one race without specific findings by the district court as to the feasibility of these techniques. Davis v. East Baton Rouge Parish School Board, 570 F.2d 1260 (5th Cir. 1978). There are no adequate time-and-distance studies in the record in this case. Consequently, we have no means of determining whether the natural boundaries and traffic considerations preclude either the pairing and clustering of schools or the use of transportation to eliminate the large number of one-race schools still existing. See Mims v. Duval County School Board, 329 F.Supp. 123, 133-34 (M.D.Fla.) aff'd 447 F.2d 1330 (5th Cir. 1971).
 
 
 9
 Of particular concern are the high schools that are one race. Although students in the 4-8 grade configurations are transported within each subdistrict to centrally located schools to effect desegregation, the district court's order leaves high school students in the neighborhood schools. Within three of the four integrated subdistricts[13], this results in high schools that are still one-race schools.[14] The district court is again directed to evaluate the feasibility of adopting the Swann desegregation tools for these schools and to reevaluate the effectiveness of the magnet school concept.[15] If the district court determines that the utilization of pairing, clustering, or the other desegregation tools is not practicable in the DISD, then the district court must make specific findings to that effect.
 
 
 10
 The district court's current desegregation plan requires the DISD to provide transportation for students who are reassigned to a new attendance zone or who choose to attend a magnet school. 412 F.Supp. at 1218. A similar provision was not made for those students who choose the majority-to-minority transfer option. This omission was error by the district court. The school board, not the students or their parents, must assume the burden of transporting the students. Swann, 402 U.S. at 26-27, 91 S.Ct. at 1281. On remand, the district court is directed to include the majority-to-minority transfer option in the transportation provision of the plan finally adopted.
 
 
 11
 II. The Highland Park Independent School District
 
 
 12
 After the prior panel remanded this case to the district court, the plaintiffs joined seven independent suburban school districts in the Dallas area as defendants.[16] The plaintiffs alleged that these school districts retained vestiges of dual school systems and that they joined with the DISD in utilizing a student transfer procedure that aided the DISD in maintaining segregated schools. On the basis of this allegedly unlawful procedure, the plaintiffs sought to have the suburban school districts included in the DISD desegregation plan.
 
 
 13
 The plaintiffs moved for the voluntary dismissal of all but one of the suburban school districts, and the district court dismissed them without prejudice. The remaining school district, Highland Park Independent School District, was dismissed with prejudice by the district court after an evidentiary hearing. Tasby v. Estes, 412 F.Supp. 1185 (N.D.Tex.1975).
 
 
 14
 The Highland Park Independent School District was created in 1914. It generally serves as the school district for the cities of Highland Park and University Park, although its boundaries are not coterminous with those of the cities. At the time of its inception, the Highland Park school system was outside the city limits of Dallas; now, the city of Dallas completely surrounds Highland Park and University Park. The school system is comprised of six schools,[17] and the current enrollment has stabilized at approximately 4,600 students, all of whom are Anglo. The DISD has approximately thirty times more students than the Highland Park system.
 
 
 15
 Prior to 1958, the Highland Park System conformed with Texas law and segregated school children by race.[18] In order to accomplish this, the few black school children residing within the school district were transported to the DISD, with their tuition being paid by the Highland Park school system.[19] Some Anglo students were allowed to transfer into the Highland Park system until 1971, primarily because either they resided in the cities of Highland Park or University Park or they had moved out of the school district and were being allowed to continue their education in the system. 412 F.Supp. at 1190-91.
 
 
 16
 The district court found that the Highland Park Independent School District has not maintained a policy of school segregation since 1958. This finding is supported by the record and, as it is not clearly erroneous, is accepted by this court. Fed.R.Civ.P. 52(a). Given this twenty year history of nondiscrimination and the negligible effect that the system's prior policy of segregation had on the DISD or its own system, we find that the district court did not err in refusing to include the Highland Park Independent School District in the student assignment plan for the DISD. See Dayton Board of Education v. Brinkman, 433 U.S. 406, 97 S.Ct. 2766, 2775-76, 53 L.Ed.2d 851 (1977); Milliken v. Bradley, 418 U.S. 717, 94 S.Ct. 3112, 41 L.Ed.2d 1069 (1974).
 
 
 17
 III. The Acquisition and Sale of School Sites.
 
 
 18
 On October 11, 1976, following the implementation of the district court's plan to desegregate DISD, the Board of Education of the DISD[20] unanimously resolved that an election be called to authorize the Board to issue $80,000,000 in bonds for school site acquisitions, construction, and equipment. The bond issue passed overwhelmingly in all subdistricts on December 11, 1976.
 
 
 19
 The prior panel had directed the district court
 
 
 20
 to evaluate all of the site acquisition, school construction and facility abandonment plans put forward by the DISD in light of the impact which these undertakings will have upon the disestablishment of the dual school system. Only those projects which will foster the desegregation process should be approved by the district court and such approval should be given only after full hearing and after the making of findings of fact and conclusions of law regarding each such project.
 
 
 21
 517 F.2d at 110. The DISD submitted forty-two plans, including thirty-two site acquisitions and constructions and ten abandonments, to the district court on February 17, 1977, and a hearing was held on February 24. On March 2, the district court approved each of the plans. In appeal No. 77-1752, the NAACP questions the district court's approval of two of these plans: the acquisition of the A. Harris Shopping Center for conversion into a school[21] and the sale of one parcel of unimproved land. The shopping center and the land in question are both located in the East Oak Cliff subdistrict.
 
 
 22
 The A. Harris Shopping Center site occupies twenty-eight acres of land, divided into two tracts by a street. There are 305,000 square feet of existing building space on the eighteen acre tract. The site was purchased by the DISD for approximately $1,800,000, an amount far below what it would cost the DISD to purchase twenty-eight acres and build comparable floor space.[22] The DISD proposed an initial outlay of $500,000 for renovation of the existing structures, with an additional $1,000,000 to be spent over the next five years. 2d Supp.Record, vol. 1, at 29, 167, No. 77-1752.
 
 
 23
 The DISD's plans for the shopping center complex include a K-12 school[23], facilities to provide a number of education services[24], and facilities to provide social services[25]. There will also be traditional grade levels K-3, 4-6, 7-8, and 9-12. These different educational operations will be conducted as distinct facilities with separate administrations, teaching staffs, and physical education programs. The DISD anticipates that it will ultimately assign approximately 2,400 students to the traditional K-12 school units.
 
 
 24
 The crux of the NAACP's argument about the shopping center site is that its location in East Oak Cliff, with an attendance zone that encompasses only East Oak Cliff schools, perpetuates school segregation in Dallas. Virtually all of the students to be assigned to the new school will be black. NAACP also raises questions concerning the combination of programs to be implemented in the shopping center site. One of the programs is to be a "metropolitan" school, an alternative school for "troubled" students, i. e., those students who experience difficulty in the more traditional school setting. Also raised as grounds for not converting the shopping center to educational use are the traffic problem because of its location near two freeways and the inferiority of the facilities.[26]
 
 
 25
 We defer to the DISD's expertise in establishing suitable programs for the school children of Dallas. The long-range plans for the shopping center site include many valuable facets for the education of the community. The DISD has stated that the programs will be separated, the existing structures will be renovated, and unoccupied space will be converted to traditional recreational and playground space suitable for the various grade-level school units. We are remanding this case to the district court for further consideration of its student assignment plan; on remand, the district court is directed to consider assigning Anglo students to the new complex. As the DISD notes, the shopping center site is easily accessible to the entire city. 2d Supp.Record, vol. 1, at 30, No. 77-1752. Time-and-distance studies should emphasize the feasibility of transporting Anglo students to attend school there.
 
 
 26
 The unimproved land in question is located on the southern edge of East Oak Cliff, some twenty-five miles from the northern edge of the DISD. It is therefore isolated from the remaining Anglo students who do not reside in naturally integrated areas. The record also reflects that the site has poor access potential. Given these facts in the record, we find no error in the district court's approval of the sale of this land.
 
 
 27
 The Concerned Citizens of Glenview, a corporation of parents of school children who will be assigned to the shopping center complex under the present student assignment plan, brought a separate action to enjoin construction and renovation of the A. Harris Shopping Center. On May 18, 1977, the district court held a hearing on the Concerned Citizens' request for injunctive relief. At that hearing, the district judge ruled that this case should be dismissed on the basis of the doctrine of virtual representation, i. e., Concerned Citizens was in effect represented by the NAACP when the issue was presented in the Tasby case. The Concerned Citizens claims on appeal that the focus of its suit, that the shopping center facility will be inferior thereby denying the students equal protection of the laws, is different from that of the NAACP, that the use of the shopping center will perpetuate a dual school system.
 
 
 28
 We have considered the adequacy of the proposed shopping center facility in connection with the NAACP's appeal. Our disposition in that case renders moot the appeal of the Concerned Citizens of Glenview.
 
 IV. Conclusion
 
 29
 In No. 76-1849, we REMAND the case to the district court for the formulation of a new student assignment plan and for findings to justify the maintenance of any one-race schools that may be a part of that plan. The district court is directed to include in its plan a majority-to-minority transfer option with adequate transportation. As for the remaining provisions of its order here under review, the district court is to reassess such provisions in light of the remedy it fashions with respect to school assignments. The district court's exclusion of the Highland Park Independent School District from its desegregation plan for the DISD is AFFIRMED.
 
 
 30
 In No. 77-1752, the district court's approval of the sale of the ten-acre parcel of land in East Oak Cliff and the acquisition of the A. Harris Shopping Center is AFFIRMED, with the proviso that the district court consider the feasibility of desegregating the new complex. The appeal in No. 77-2335 is DISMISSED as moot.
 
 
 
 [1]
 The first action to desegregate the Dallas schools was filed in 1955. For a discussion of the Fifth Circuit precedents relating to the desegregation of the DISD, see Tasby v. Estes, 517 F.2d 92, 95 (5th Cir.), cert. denied, 423 U.S. 939, 96 S.Ct. 299, 46 L.Ed.2d 271 (1975)
 
 
 [2]
 In 1975, following remand, the NAACP moved to intervene in the DISD desegregation case, Tasby v. Estes, stating that it represented the interests of its members, and its members' children, in the protection of constitutional rights. Record, vol. 1, at 48-51, No. 76-1849. At the hearing held by the district court on the NAACP's motion, counsel for the NAACP moved to amend the motion to intervene by adding the names of three school children. 13th Supp. Record, vol. 7, at 13, No. 76-1849. The DISD continues to contend, as it did below, that the NAACP lacks standing to be a party in this case. We find the DISD's contention to be groundless. We consider the criteria for intervention in a school desegregation case, as established by Hines v. Rapides Parish School Bd., 479 F.2d 762 (5th Cir. 1973), to have been met and affirm the district court's order granting intervention
 
 
 [3]
 This subdistrict has approximately 27,500 students attending sixteen schools. For the purpose of this opinion, we define as one-race a school that has a student body with approximately 90% Or more of the students being either Anglo or combined minority races. We reiterate the admonition of the prior panel, however, that the 90% Figure is not a "magic level below which a school (will) no longer be categorized as 'one-race.' " 517 F.2d at 104
 
 
 [4]
 This issue arose from the district court's order in Tasby v. Estes, reported at 412 F.Supp. 1185 (N.D.Tex.1976), and is part of appeal No. 76-1849
 
 
 [5]
 Following the implementation of the district court's desegregation plan now under review, the district court authorized the DISD to acquire a shopping center for conversion into classrooms and administrative facilities and to sell a ten-acre parcel of unimproved land. 22d Supp. Record, vol. 1, at 1, No. 76-1849. The propriety of this action is raised in appeal No. 77-1752, brought by the NAACP. In appeal No. 77-2335, the Concerned Citizens of Glenview, a corporation of parents of children who will be assigned to the converted shopping center, appeals the dismissal by the district court of a separate action that it brought to halt the conversion of the shopping center
 
 
 [6]
 In 1971, the DISD was 69% Anglo; in 1975, it was 41.1% Anglo, 44.5% Black, 13.4% Mexican-American, and 1% "other" races
 
 
 [7]
 Plans were also submitted by a group of students at Skyline High School, the Alliance for Integrated Education, and "a number of other groups and concerned parents." 412 F.Supp. at 1194 n.4
 
 
 [8]
 The DISD has taken a rather unique position in this appeal. It supports the present plan in toto, but seeks to have the administrative portions of the plan vacated if the student assignment portion is not upheld. The Curry intervenors, who have represented a group of residents in a northern section of the DISD since 1971, claim that the district court erred in ordering a strict 44% Anglo, 44% Black, 12% Mexican-American ratio for all future DISD top administrative posts. Because we wish to grant the district court enough latitude on remand to devise a plan that will be workable, we are not binding it to the present non-student-assignment portions of its order
 
 
 [9]
 Although the order specifies these grade configurations, the DISD's facilities combine K-6 in most elementary schools
 
 
 [10]
 Two exceptions were made by the district court in order to convert elementary school facilities to magnet school use. Emphasis is placed on improving the quality of early education in these Early Childhood Education Centers
 
 
 [11]
 Under this provision, any student assigned to a grade configuration in a particular school
 in which the percentage of members of his race is greater than the District-wide percentage of members of his race for (that grade configuration) shall be permitted to transfer to any . . . school in the District containing his grade level in which the percentage of members of his race is less than the District-wide percentage members of his race for (that grade configuration).
 
 
 [412]
 F.Supp. at 1217. Mexican-Americans, however, are permitted the option of minority-to-majority transfers if they comprise less than five percent of the school to which they are originally assigned. This provision was made to afford them the opportunity to transfer to a school that offers the DISD's Bilingual Education Program. 412 F.Supp. at 1218
 
 
 [12]
 The magnet concept is designed to attract students to a school because of the special career, vocational, or other programs it offers. Magnet schools proposed by the DISD will provide intensive training in a number of fields, including mathematics/science, child-related careers, creative arts, business and management, and health professions. The number of black, Mexican-American, and Anglo students in each magnet comprehensive high school was ordered to be in proportion, plus or minus 10%, to the percentage of each group in the 9-12 student population in the DISD. 412 F.Supp. at 1215-16
 
 
 [13]
 This excludes East Oak Cliff, the black subdistrict, and Seagoville, the one predominantly Anglo subdistrict
 
 
 [14]
 In the Northwest subdistrict, one high school is 95% Minority and two high schools are 96% Anglo. In the Northeast subdistrict, one high school is 99.8% Minority and one is 95% Anglo. In the Southeast subdistrict, one school is 100% Minority and one is 89% Anglo
 
 
 [15]
 The NAACP's brief cites a statement to the press by Dr. Nolan Estes, superintendent of the DISD, that the magnet school concept has not been effective in desegregating the school system in Dallas. Brief for Intervenors-Appellants, No. 77-1752, at 7
 
 
 [16]
 These school districts were Carrollton-Farmers Branch, DeSoto, Duncanville, Highland Park, Irving, Lancaster, and Wilmer-Hutchins Independent School Districts
 
 
 [17]
 There are four elementary schools, one middle school, and one high school in the Highland Park school system
 
 
 [18]
 Even after the Supreme Court's decision in Brown v. Bd. of Education, 349 U.S. 294, 75 S.Ct. 753, 99 L.Ed. 1083 (1955), Texas laws required segregation. The penalties for violating the statutes included loss of funding and accreditation. 412 F.Supp. at 1189
 
 
 [19]
 The figures show that the greatest number of black students for whom tuition was paid by the Highland Park school system during any academic year was eleven. 412 F.Supp. at 1190
 
 
 [20]
 This body was composed of six Anglos, two blacks, and one Mexican-American
 
 
 [21]
 The NAACP filed a motion to stay the conversion of the shopping center, which the district court denied on April 5, 1977. The NAACP then filed a motion to stay with this court, and we carried the motion with the case. In accordance with our determination of the merits of this issue, that motion is denied
 
 
 [22]
 Testimony in the record indicates that it would cost more than $30.00 a square foot to construct this amount of building space. 2d Supp.Record, vol. 1, at 28-29, No. 77-1752
 
 
 [23]
 This K-12 school is to be developed as a career education program under a $600,000 grant. The district court ordered the DISD to implement this program "as rapidly as possible." 412 F.Supp. at 1216
 
 
 [24]
 These educational services are to include a preschool, a continuing education program (evening), a personnel development center, a gifted and talented program, a fine arts center, a recreational center (day and evening), an extended day program, alternative schools for troubled students, a vocational/industrial arts program, pupil personnel services or special education, and instructional services
 
 
 [25]
 These social services are to include a senior citizens program, a health services agency, family services, a parent education program, and employment agencies
 
 
 [26]
 No playgrounds were available and the existing structure was allegedly dilapidated and structurally deficient