Anthony T. LEE, et al.,
Plaintiffs–Appellees,

United States of America, Plaintiff–
Intervenor and Amicus Curiae–
Appellee,

National Education Association, Inc.,
Plaintiff–Intervenor–Appellee,

Brandie McKee, a minor, by Thomas
McKee, her father and next friend, Ish-
bah Cox, et al., Plaintiffs–Intervenors–
Appellees,

v.

MACON COUNTY BOARD OF
EDUCATION, et al., De-
fendants–Appellants.

No. 91–7640.

United States Court of Appeals,
Eleventh Circuit.

Aug. 18, 1992.

---

Deborah H. Biggers, Tuskegee, Ala., for Macon County Bd. of Educ., et al.

George L. Beck, Jr., Dennis R. Pierson, Montgomery, Ala., for Brandie McKee, Thomas McKee, Ishbah Cox, Ruben Cox, Anderson, Redding and Save Our School Committee.

Before KRAVITCH, Circuit Judge, CLARK *, Senior Circuit Judge, and Pittman **, Senior District Judge.

CLARK, Senior Circuit Judge:

This is an appeal from a district court order entered as part of that court's continuing jurisdiction over the Macon County, Alabama, school system. The district court's order denied the petition of the Macon County Board of Education to close grades nine through twelve at Notasulga High School, the county's only nonracially identifiable school. We affirm.

* *See* Rule 34–2(b), Rules of the U.S. Court of Appeals for the Eleventh Circuit.

** Honorable Virgil Pittman, Senior U.S. District Judge for the Southern District of Alabama, sitting by designation.

## BACKGROUND FACTS

This school desegregation case was initiated in 1963 by black children and their parents residing in Tuskegee, Alabama. In August 1963, the Honorable Frank M. Johnson, then a district court judge in the Middle District of Alabama, ordered the Macon County Board of Education to immediately take steps to desegregate the schools of Macon County.[1] As any student of the civil rights movement is well aware, this district court order met with extremely hostile and sometimes violent resistance at every level. In 1963 and 1964 alone, the district court found it necessary on four different occasions to enjoin Governor George C. Wallace and other state officials from interfering with the desegregation of the Macon County school system.[2]

Unfortunately, Notasulga High School, a kindergarten through twelfth grade school located in the northern part of Macon County, did not escape this disgraceful history. When the first six black students arrived at Notasulga in February 1964, the mayor of the City of Notasulga refused to permit them to exit the school bus. After entry of yet another district court order, these six black students were able to enroll at Notasulga a week later, but white students boycotted the school completely, fleeing to private academies that had been established in response to court-ordered integration. The six black students became the entire student body of Notasulga High School. Worse yet, on April 19, 1964, arsonists burned Notasulga. The six black students, still the sole members of the Notasulga student body, finished the school year in makeshift classrooms in the undamaged auditorium. It took over a year to rebuild the burned school.

From 1965 to 1970, Notasulga functioned as a predominantly white school. Finally, in the spring of 1970, the Board announced plans to integrate the school through dis-

1. *Lee v. Macon County Board of Education,* 221 F.Supp. 297 (M.D.Ala.1963).

2. *See Lee v. Macon County Board of Education,* 267 F.Supp. 458 (M.D.Ala.), *aff'd,* 389 U.S. 215, 88 S.Ct. 415, 19 L.Ed.2d 422 (1967).

trict zoning. This announcement, like past desegregation orders, met with resistance. Nevertheless, a math teacher by the name of Robert Anderson and two other faculty members at Notasulga undertook to achieve what appeared to be impossible; they sought to stem "white flight" to the newly-created private academies and thereby establish at Notasulga an integrated, nonracially identifiable school. While segregationists traveled door-to-door attempting to convince whites to flee the public school system, Anderson traveled door-to-door with the opposite message. Anderson handed out printed handbills touting the advantages of federal and state funded public schools and equating the placement of children in the newly-created private academies to sending them to unlicensed doctors. These efforts met with limited success; the student enrollment for the 1970–71 school year was 30% white, rather than the 50% white enrollment that should have resulted from the district zoning. Some "white flight" had occurred.

Soon, however, there was a reversal in the tide of "white flight." In 1971, Anderson was named principal of Notasulga, and he continued his efforts to achieve racial balance and harmony at Notasulga. Eventually, the community, both white and black, began to rally in support of his efforts. In the 1971–72 school year, white students began to return to Notasulga from the private academies. By the 1973–74 school year, the student enrollment at Notasulga was 52% black and 48% white, with 259 black students and 240 white students. Racial balance had been achieved.

Thus, notwithstanding its disheartening beginning, integration was achieved at Notasulga in 1973. Through the continued efforts of Robert Anderson and the continued support of the community, Notasulga has remained integrated for nearly 20 years. Throughout this time, it has maintained a total student population that is between 40% and 50% white; in the 1990–91 school year, its total enrollment was 57% black and 43% white, with 359 black students and 273 white students, and its high school enrollment (grades nine through twelve) was 64% black and 36% white, with 122 black students and 68 white students. Notasulga's faculty is 60% black and 40% white, and its extracurricular clubs, athletic programs, and other activities are similarly racially balanced. To its integrated student body, Notasulga offers a quality education. High school students at Notasulga choose from a well-rounded curriculum; they may choose to pursue a standard diploma or, through an honors program, an advanced diploma, which prepares them for college. Notasulga has also been successful in maintaining a healthy enrollment; its enrollment has increased by 27% since 1973, while those in the remainder of the county have decreased. Since 1974, Notasulga has received national attention as a model for the successful integration of southern schools. As Robert Kennedy, Jr. said in a speech at Notasulga in 1980, " 'What you've done here in Notasulga … is a shining example not only for Alabama and the South but the nation and the entire world.' "[3]

In marked contrast to Notasulga, the other schools in Macon County are not integrated. These schools are almost totally black, as "white flight" has taken its toll. In 1990, the Board operated three schools in Macon County, other than Notasulga, with ninth through twelfth grade enrollments: Deborah Cannon Wolfe High School, a kindergarten through twelfth grade school; South Macon High School, a kindergarten through twelfth grade school; and Tuskegee Institute High School, a ninth through twelfth grade school. In the 1990–91 school year, these three schools had a combined enrollment of 1886 students, of whom 13, or less than 1%, were white; in the ninth through twelfth grades, these three schools had a combined enrollment of 1110, of whom 6 were white. The efforts to integrate these three schools have failed.

Sometime prior to March 1991, the Board decided to build a new high school in Macon County, and it requested that the State Department of Education conduct a survey

3. Intervenors' Trial Exhibit 32.

of the Macon County school system and make recommendations as to school construction, consolidation, and site selection. In March 1991, the state presented to the Board the Report of a Partial Survey of the Macon County School System.[4] In this report, the state noted that the high school enrollment in the Macon County school system had decreased substantially from 1982 to 1990, but that the enrollment at Notasulga had actually *increased* during this period. The state also noted that, "Notasulga is the only school in the county where significant integration of pupils occurs." Relying on these two facts, the state recommended that the Board close the ninth through twelfth grades at Deborah Cannon Wolfe and South Macon and consolidate them at Tuskegee Institute; the state further recommended that the Board continue to operate Notasulga, the only integrated school in the county, as a kindergarten through twelfth grade school. This recommendation is the course of action that the state would have preferred that the Board take, as it kept intact the county's only integrated school. The state also offered, however, an alternative recommendation. This alternative recommendation was that all ninth through twelfth grade students in the county, including those at Notasulga, attend the proposed new consolidated high school to be built in Tuskegee.

The Board adopted the state's alternative recommendation. In April 1991, the Board filed its petition seeking court approval for the closing of the high schools, that is, grades nine through twelve, at Notasulga, Deborah Cannon Wolfe, South Macon, and Tuskegee Institute, and the consolidation of these high schools at a newly-constructed, comprehensive high school. The Board represented that, assuming all white high school students presently attending public schools in Macon County remained in the system after the consolidation, the consolidated high school would have 88 white students out of a total population of 1361 students; that is, assuming there would be no "white flight" as a result of the consoli-

dation, the consolidated high school would be approximately 6% white. In the last paragraph of the petition, the Board admitted:

> Although some "white flight" is expected, due to the consolidation of Notasulga High School, the Board will continue to hold public meetings and keep the Macon County community appraised of the benefits and educational advantages the students will receive as a result of the action described herein.[5]

The Board did not speculate on how much "white flight" would occur.

In response to the Board's petition, a group of students, parents, and others interested in the future of Notasulga High School filed a motion to intervene as plaintiffs in the case. The plaintiffs-intervenors opposed the closing of the high school at Notasulga, alleging that the Board should not be permitted to eliminate the only integrated high school in Macon County to create a single, black high school. The district court granted the motion to intervene.

Following a bench trial on the Board's petition, the district court issued an order and opinion in favor of the plaintiffs-intervenors.[6] To give further understanding to the peculiar facts of this case, we quote extensively from the district court's opinion:

> The student-teacher ratio would, of course, be better at Notasulga High School, and there was much testimony that the parental involvement (which is crucial to a high school) was exemplary at Notasulga High School. The Intervenors argued that, although some classes are offered only in alternate years at Notasulga High School, nonetheless, these classes are offered. Dr. Wayne Teague, State Superintendent of Education, testified that the proposed curriculum for the upcoming school year at Notasulga High School was a "quality curriculum". Dr. Teague also stated that there are ways for a small school to

---

**4.** Intervenors' Trial Exh. 38.

**5.** R1–2 at 3.

**6.** R1–18; R1–19.

compete with a larger school. Some classes are now taught using "audiographics" [Robin Lambert (Intervenors' expert) explained this technique in some detail], and other classes are taught by teachers who teach at more than one school. Dr. Teague further testified that, if a system could afford it, a small school is the best school.

.     .     .     .     .

[The] undenied testimony is that, even if every student, white and black, from Notasulga High School attended the comprehensive high school, the student population would be approximately 94 percent black and six percent white. This student ratio is not, for any substantial purpose, desegregated.

.     .     .     .     .

Ms. Robin Lambert [whom this Court recognized as an expert on rural education] testified, basically, that a smaller school is a better school. Ms. Lambert noted that in a smaller school there are more spots open for extracurricular activities; that there is better achievement, especially among the low income; that there are fewer problems with drugs and crime; and there is greater parental involvement. Ms. Lambert also testified that, based on her experience, consolidation leads to the segregation of schools.

.     .     .     .     .

Busing to Tuskegee would require all students currently attending Notasulga High School to spend a substantial amount of time on a bus. There was also testimony that in the afternoons there would be "double" busing for some of the Notasulga High School students. Students currently at Notasulga High School and their parents would find it more difficult to participate in extracurricular activities if they have to be bused.

.     .     .     .     .

The numbers, as this Court understands them, solidly back up the Intervenors' position. From testimony given during trial, it is the understanding of this Court that, if every white student from Notasulga High School were to enroll in the new comprehensive high school (estimated at 1200 students), the student ratio would be approximately 94 percent black and six percent white. Macon County's population as a whole is approximately 85 percent black and 15 percent white. The current racial make-up of Notasulga High School is 58 percent black and 42 percent white, making it the only integrated high school in the Macon County School System. Very few white students attend the other high schools in Macon County, which are all, with the exception of Notasulga High School, far in excess of 90 percent black. [Footnote omitted.] Testimony was presented that Notasulga High School has held its racial composition at somewhere between 55–65 percent black and 35–45 percent white for a substantial length of time in compliance with this Court's Orders. . . .

.     .     .     .     .

The Court was most impressed with the testimony and credentials of Dr. Byas, a black educator, because of his education, his experience as a teacher, principal, administrator, superintendent (in Macon County for seven years and for 10 years in the State of New York), educational consultant, and his extensive experience with the Macon County School System and, specifically, his understanding of the benefits to all integrated students based on his lengthy experience with Court-ordered desegregation plans.

.     .     .     .     .

When asked about the importance of an integrated learning environment, Dr. Byas said:

"Leadership development, dealing with all human beings connected with the school enterprise, is of utmost importance. I'll just concentrate a little bit on students. The Notasulga High School over the twenty-one years has provided not only integrated education, but integrated extracurricular activities. And it's in extracurricular activities that people are elected presidents of student councils and secretaries and

where they are elected captains of teams and they're elected queens. And you could go on with multifaceted—a number of kinds of things in that area where students are given the opportunity to exert and to develop leadership potential. And at Notasulga over the twenty-one years, they've done that in an integrated setting. * * * when we leave school, and we either go to college or the work place, we find integrated settings throughout. And people who have had uniracial experience, whether it's black or white, suddenly find themselves in a work place or in college where it's multiracial, obviously, they've got to make some significant adjustments. Some people will come up short. They may not be able to make those sorts of adjustments. So it is important. Now, if that's destroyed, then of course, there would be no opportunity. Let me add this. By Notasulga being integrated in its activities, any intercollegiate competition in the high school, competition with other schools, they bring integrated teams and integrated student body to what might be referred to as an all black setting there in the county where they play other schools. And when they have other meetings and competitions, as they do in chorus festivals and exchange of assembly programs, they bring, even to the other schools on those occasions, the only opportunity for seeing any integrated activities and sessions. Now, if that's eliminated, you eliminate not only the opportunity for that development at Notasulga, but the opportunity for kids at the consolidated high school seeing integrated leadership among extracurricular activities as well as among the class officers and that sort of thing." [7]

In rendering its decision for the plaintiffs-intervenors, the district court did not conclude that the Board's plan to close the high school at Notasulga was racially motivated. Rather, the court concluded that the plan could not be approved because, "irrespective of discriminatory intent, [the plan] does not foster desegregation or eradication of the vestiges of the former dual system." [8] The district court found that the consolidation of the high school at Notasulga would inevitably lead to the loss of white students through "white flight." Thus, the district court concluded, the Board's plan would destroy the only integrated high school in the county and would result in the establishment of a single-race school system in Macon County. Accordingly, the district court denied the Board's petition to close the high school at Notasulga and consolidate it with the other high schools in the county.[9] The Board appealed.

## DISCUSSION

■ We agree with the district court's decision to deny the Board permission to close the high school at Notasulga. We are presented with a novel issue. When this case started twenty years ago, there were schools in Macon County with black students only and schools with white students only. Now *de jure* segregation has ended but still there are three racially identifiable black high schools, each with a white student population of less than 2%. In the twenty year effort to eliminate segregated schools, the Deborah Cannon Wolfe High School, the South Macon High School, and Tuskegee Institute High School have lost practically all of their white students either through demographic changes or "white flight" to private schools. At the other extreme, there is Notasulga High School, which is not racially identifiable, has 57% black students and 60% black faculty, and can be rightly said to have accomplished the goals of the 1963 desegregation order. The Board seeks to eliminate the only integrated school in the county and the area and to send black and white students from Notasulga to a high school

---

7. R1–18 at 9, 10, 11, 11–12, 15–16, 17, 21.

8. R1–18 at 14.

9. The district court granted the Board's petition in all other respects.

where the black student population would exceed 94% after their arrival.

It may be correct to say that desegregation has been significantly accomplished when a dual system of schools has been eliminated. Yet the lessons of *Brown v. Board of Education*[10] and Richard Kluger's book *Simple Justice*[11] reach beyond a mere abolition of the dual school systems. Integrated schools, if not an objective, were at least an intended by-product of the desegregation decisions. Such could not be accomplished without eliminating the dual systems. In considering the problem posed by this case, we first take into account that, while desegregation has been achieved, it has resulted in three racially identifiable black schools and one integrated school. We then ask: where a school board's proposed closing of a viable, integrated, nonracially identifiable school would contribute nothing to the goal of desegregation but would simply merge the integrated school into a school that is black identifiable with a *de minimis* effect on the black school's population, is the school board being faithful to *Brown v. Board of Education* and its progeny?

We do not hold that a merger similar to this would never be appropriate. We decide this case on its facts and its history and conclude that the district court was correct in not approving the consolidation. To hold otherwise would deprive the Notasulga black and white students from enjoying the learning experience of an integrated school where they can prepare for life in an integrated society.

As early as *Brown v. Board of Education*, the Supreme Court implicitly recognized that one of the goals of constitution-ally mandated desegregation is the racial integration of the public schools. Quoting with approval from the Kansas district court opinion, the Court said: " 'Segregation ... has a tendency to [retard] the educational and mental development of Negro children and to deprive them of some of the benefits *they would receive in a racial[ly] integrated school system.'* "[12] Notwithstanding this language, some federal courts in the early school desegregation cases misunderstood the implications of *Brown*. In *Briggs v. Elliott*,[13] which was issued just a year after *Brown*, a three-judge panel in South Carolina declared that *Brown* "does *not* require integration."[14] This language, although dictum, was relied upon for a decade by those who sought to circumvent the mandate of *Brown* by perpetuating school segregation. As one historian has put it, this language "was widely seized upon by Southern courts to approve a variety of maneuvers designed to deflect the impact of *Brown* in those states and school districts that did not turn to outright defiance of the [Supreme] Court."[15]

The *Briggs* dictum did not survive. First the former Fifth Circuit, and later the Supreme Court, rejected the *Briggs* interpretation of *Brown*. In a series of opinions issued in 1965, 1966, and 1967, the former Fifth Circuit made it clear that a school board that had operated a dual school system is under an *affirmative* duty to establish integrated, nonracially identifiable schools.[16] As a panel of the court noted in *United States v. Jefferson County Board of Education:*

10. *Brown v. Board of Education of Topeka,* 347 U.S. 483, 74 S.Ct. 686, 98 L.Ed. 873 (1954).

11. Richard Kluger, *Simple Justice, The History of Brown v. Board of Education and Black America's Struggle for Equality* (1980).

12. *Brown,* 347 U.S. at 494, 74 S.Ct. at 691 (emphasis added).

13. *Briggs v. Elliott,* 132 F.Supp. 776 (E.D.S.C. 1955).

14. *Id.* at 777 (emphasis added).

15. Richard Kluger, *Simple Justice, The History of Brown v. Board of Education and Black America's Struggle for Equality* 752 (1980).

16. *See Singleton v. Jackson Municipal Separate School District,* 348 F.2d 729 (5th Cir.1965); *Singleton v. Jackson Municipal Separate School District,* 355 F.2d 865 (5th Cir.1966); *United States v. Jefferson County Board of Education,* 372 F.2d 836 (5th Cir.1966), *opinion adopted on rehearing en banc,* 380 F.2d 385 (5th Cir.) (en banc), *cert. denied,* 389 U.S. 840, 88 S.Ct. 77, 19 L.Ed.2d 104 (1967).

As we see it, the law imposes an absolute duty to desegregate, that is, disestablish segregation. And an absolute duty to integrate, in the sense that a disproportionate concentration of Negroes in certain schools cannot be ignored; racial mixing of students is a high priority educational goal.[17]

The en banc court, adopting the panel's opinion, added:

The Court holds that boards and officials administering public schools in this circuit [footnote omitted] have the *affirmative duty under the Fourteenth Amendment to bring about an integrated, unitary school system in which there are no Negro schools and no white schools—just schools.* Expressions in our earlier opinions distinguishing between integration and desegregation [footnote omitted] must yield to this affirmative duty we now recognize. In fulfilling this duty it is not enough for school authorities to offer Negro children the opportunity to attend formerly all-white schools. The necessity of overcoming the effects of the dual school system in this circuit *requires integration of faculties, facilities, and activities, as well as students.*[18]

The following year, in *Green v. County School Board of New Kent County, Virginia,*[19] the Supreme Court also rejected the *Briggs* interpretation of *Brown.*[20] In *Green,* the Supreme Court held that a school board's "freedom of choice" plan was not sufficient to meet its obligations under *Brown* because the vast majority of children in the school system still attended racially identifiable schools. As the former Fifth Circuit had done, the Supreme Court placed on school boards "the affirmative duty to take whatever steps might be necessary to convert to a unitary system in which racial discrimination would be eliminated root and branch."[21] In language very similar to that used by the Fifth Circuit, the Supreme Court required school boards to "fashion steps which promise realistically to convert promptly to a system without a 'white' school and a 'Negro' school, but just schools."[22]

By 1970, then, it was quite clear that school boards that had in the past operated dual systems were under an affirmative duty to establish integrated, unitary school systems with nonracially identifiable schools.[23] Unfortunately, the execution of this affirmative duty in much of the south led to the exodus of white students from the public schools into segregated private academies. This was especially true in the counties with large black majorities in the general population; due to white flight, the public schools in many of these counties

---

17. 372 F.2d at 846–47 n. 5.

18. 380 F.2d at 389 (emphasis added).

19. *Green v. County School Board of New Kent County, Virginia,* 391 U.S. 430, 88 S.Ct. 1689, 20 L.Ed.2d 716 (1968).

20. *See Keyes v. School District No. 1, Denver, Colorado,* 413 U.S. 189, 200 n. 11, 93 S.Ct. 2686, 2693–94 n. 11, 37 L.Ed.2d 548 (1973) (Supreme Court noted that *Green* rejected the interpretation of *Brown* expressed in *Briggs* ); *Walker v. County School Board of Brunswick County, Virginia,* 413 F.2d 53, 54 n. 2 (4th Cir.1969) (citing *Green,* Fourth Circuit noted that "[t]he famous *Briggs v. Elliott* dictum ... is now dead").

21. *Green,* 391 U.S. at 437–48, 88 S.Ct. at 1694.

22. *Id.* at 442, 88 S.Ct. at 1696.

23. A school becomes racially identifiable when students of one race reach a certain percentage of the total student population. Courts have applied different percentages. *See Estes v. Metropolitan Branches of Dallas NAACP,* 444 U.S. 437, 442, 100 S.Ct. 716, 718, 62 L.Ed.2d 626 (1980) (Powell, J., dissenting from dismissal of writs of certiorari) (noting application of 75% figure); *Morgan v. Nucci,* 831 F.2d 313, 320 (1st Cir.1987) (declining to decide whether 80% or 90% figure is more appropriate); *Riddick v. School Board of City of Norfolk,* 784 F.2d 521, 533 n. 13 (4th Cir.1986) (noting school board's use of 70% figure), *cert. denied,* 479 U.S. 938, 107 S.Ct. 420, 93 L.Ed.2d 370 (1986). We need not decide what percentage of one race renders a school racially identifiable. Under any of the percentages noted here, the high school at Notasulga, which in the 1990–91 school year was 64% black, clearly is not racially identifiable. The consolidated high school that the Board proposes, which would be 94% black even if there were absolutely no "white flight," clearly would be racially identifiable.

became racially identifiable black schools.[24] As one historian has said, the "recurrent white flight to private academies etched a somber background to bright hopes for integration." [25]

At Notasulga, by contrast, the bright hope for integration was fulfilled. Notwithstanding that Notasulga is located in a county that is approximately 85% black, it has been, for 20 years, a nonracially identifiable school. The Fifth Circuit's mandate in *Jefferson* requiring "integration of faculties, facilities, and activities, as well as students" has been fully accomplished at Notasulga; its faculty is 60% black, its student body is 57% black, and the participants in all of its activities are similarly racially balanced. Notasulga can truly be said, to paraphrase the Supreme Court, to be neither a black school nor a white school, but just a school. Notasulga is the only such school in Macon County; it offers the only integrated educational experience in the county. Moreover, setting aside for a moment its achievement of racial integration, Notasulga is otherwise successful: it offers a quality curriculum; parental involvement in the school is exemplary; and it maintains a consistent enrollment that is of an ideal size, small enough to encourage student participation and individual relationships but large enough to be economically and educationally viable. Thus, Notasulga has not only accomplished the basic constitutional goals established by *Brown* and its progeny, it has fulfilled the objective of racial harmony that is the very spirit of *Brown*.

The Board now seeks approval of a plan to close the high school at Notasulga and thereby eliminate the only nonracially identifiable high school in Macon County. The Board argues that this plan should be approved because, "although the racial mix at one school, Notasulga, will be adversely affected, the overall racial mix among the other three high schools will significantly improve...." [26] The facts do not suggest any significant improvement. The closing of a nonracially identifiable high school such as Notasulga may be justifiable if it would create an integrated educational environment for more students in Macon County. The Board's plan in this case will *not* lead to such a desirable result. The district court made a factual finding that closing the high school at Notasulga would lead to "white flight." [27] This finding is amply supported by the evidence. Even the Board admitted that "some 'white flight'" is expected. Robert Anderson, among others, testified that the closing of the high school at Notasulga would result in "massive white flight" and that this "white flight" would occur not only from the high school grades forced to attend the consolidated high school, but also from the kindergarten through eighth grades remaining at Notasulga.[28] Thus, the Board's plan would result in a consolidated high school that is *at least* 94% black and would cause "white flight" from the kindergarten through eighth grades remaining at Notasulga, thereby destroying the favorable racial mix and undermining the viability of Macon County's only integrated elementary and junior high schools.

Even if there were *no* "white flight" as the result of the Board's plan, the consolidated high school would be 94% black, as

---

24. J. Harvie Wilkinson, III, *From Brown to Bakke, The Supreme Court and School Integration: 1954–78* 121 (1979).

25. *Id.*

26. Appellant's Brief at 36.

27. In considering the effect of a school board's plan, it is proper and appropriate for a district court to consider possible "white flight" from the public school system. *See Wright v. Council of City of Emporia,* 407 U.S. 451, 464–65, 92 S.Ct. 2196, 2204, 33 L.Ed.2d 51 (1972) (Supreme Court noted with approval district court's consideration of white flight when deciding that new school district boundaries would impede the process of desegregation); *see also Milliken v. Bradley,* 418 U.S. 717, 801, 94 S.Ct. 3112, 3155, 41 L.Ed.2d 1069 (1974) (Marshall, J., dissenting) ("Under our decisions, it was clearly proper for the District Court to take into account the so-called 'white flight' from the city schools...."); *Stout v. Jefferson County Board of Education,* 537 F.2d 800, 802 (5th Cir.1976) (in choosing between various permissible desegregation plans, school board may elect one calculated to minimize "white flight").

28. R4–73.

opposed to 99% black without the Notasulga students. The 94% black consolidated high school would be racially identifiable while Notasulga high school, which must be eliminated to accomplish the 94% figure, is not. The five percentage point difference between 99% and 94% is not sufficient to bring to the children at the consolidated high school the integrated experience that is a goal of *Brown* and its progeny. Dr. Teague, the State Superintendent of Education, testified at the trial of this case that the children attending the consolidated high school proposed by the Board would "not have the benefits of an integrated system." [29] His opinion is supported by the opinions of other experts. As one court has noted: " 'Research by various experts indicates that for effective participation and healthy interpersonal interaction among students, an ethnic or racial group in the numerical minority should ordinarily comprise at least 20% of the student body.' " [30] Thus, the closing of the high school at Notasulga, the only nonracially identifiable high school in Macon County, cannot be justified by the slight change that it may bring to the racial mix of the consolidated high school.

Our conclusion finds support in other cases that have dealt with proposals that affect nonracially identifiable schools. For example, in *Tasby v. Wright*,[31] the district court had adopted a proposal aimed at improving the racial mix in certain schools by altering the attendance zones of some naturally integrated areas contiguous to these schools. The Fifth Circuit recognized that the "naturally desegregated schools ... should have been left undisturbed if possible." [32] It then concluded that the district court had abused its discretion by adopting the proposal altering the attendance zones:

It is precisely because the numerical change on the desegregation side of the balance sheet is so small ... that the major symbolic importance of the change to the naturally desegregated area cannot be justified. No one disputes the idea that a naturally desegregated school provides the greatest promise of successful and stable integration.[33]

Likewise, in this case, the incremental change in the racial mix of the consolidated high school is insufficient to justify the elimination of Notasulga, the *only* school in Macon County that holds any promise of successful and stable integration.

We also find instructive here the former Fifth Circuit's opinion in *Stout v. Jefferson County Board of Education.* In *Stout*, the district court had declined to adopt a proposal by the government that two all-black schools, Gaston and Roosevelt, be paired with integrated schools to improve the racial mix of the all-black schools. Affirming the district court's decision, the former Fifth Circuit said:

Efforts by the court in earlier orders to assign white students to [Gaston and Roosevelt] have been met by refusal of these students to attend them, and the districts with which the United States urges [Gaston and Roosevelt] be paired are themselves desegregated and functioning effectively. It was the court's conclusion that adopting the government's proposals 'would ... mean the loss of desegregated education at schools which are 30–35% black at this time, a loss of such experience to both whites and blacks, without actually providing such an experience to the Gaston and Roosevelt students.' We cannot but regard this conclusion by Judge Pointer, who has struggled with these problems effectively over the years, with great deference.[34]

---

**29.** R3–149.

**30.** *Tasby v. Wright*, 713 F.2d 90, 98 n. 10 (5th Cir.1983) (quoting the district court opinion).

**31.** *Id.*

**32.** *Id.* at 98. *See also Milliken v. Bradley*, 433 U.S. 267, 288 n. 19, 97 S.Ct. 2749, 2761 n. 19, 53 L.Ed.2d 745 (1977) (noting with approval district court plan that "prevent[ed] the disruption, by massive pupil reassignment, of racially mixed schools in stable neighborhoods which had successfully undergone residential and educational change").

**33.** *Tasby v. Wright*, 713 F.2d at 98–99.

**34.** *Stout*, 537 F.2d at 802.

We concur with the district court's conclusion in this case that closing the high school at Notasulga would result in the loss of an integrated educational experience for Notasulga students without providing such an experience for the other students in the Macon County school system.

"[S]ubstantial benefits flow to both whites and blacks from interracial association...."[35] In the context of schools in particular, "racial mixing of students is a high priority educational goal."[36] In *Milliken v. Bradley*, Chief Justice Burger spoke of the dire consequences of operating schools that do not offer opportunities for interracial association:

> Children who have been thus educationally and culturally set apart from the larger community will inevitably acquire habits of speech, conduct, and attitudes reflecting their cultural isolation. They are likely to acquire speech habits, for example, which vary from the environment in which they must ultimately function and compete, if they are to enter and be a part of that community. This is not peculiar to race; in this setting, it can affect any children who, as a group, are isolated by force of law from the mainstream.[37]

At the trial of this case, Dr. Byas, an educational expert, testified to the importance of an integrated learning environment not only to those students who are fortunate enough to have the opportunity to participate in it, but also to those students in other schools in the system who are able to observe it. Thus, the integrated experience at Notasulga is of great benefit not only to the Notasulga students, both black and white, but also to other students in Macon County who observe in Notasulga's integrated teams and clubs the racial harmony that is the objective of desegregation. Eliminating the high school at Notasulga would render it impossible for any high school student in Macon County to even observe, much less participate in, an integrated educational environment. Such a result is not in keeping with the goals established by *Brown* and its progeny. Accordingly, we conclude that the district court correctly decided that it could not approve the Board's plan to close the high school at Notasulga.

■ We do not hold that a school board's plan to close a nonracially identifiable school may never be approved; indeed, there are undoubtedly many situations in which the closing of such a school would be justifiable. This, however, is not one of them. Notasulga is a viable, successful school under any standard, and the Board has offered no logical reason for closing it. We also do not hold that *Brown* and its progeny necessarily require a school board at this stage in the desegregation process to take affirmative steps either to establish or maintain a nonracially identifiable school. As the Supreme Court recently made clear in *Freeman v. Pitts*,[38] a school board is obligated to take action to remedy a current racial imbalance in the school system if it is a vestige of the prior *de jure* system, but not if it is caused merely by demographic factors. In this case, we are not requiring the Board to take any affirmative action to establish or maintain an integrated institution; rather, we are requiring that the Board *refrain from taking action* that would close the high school in the only integrated institution in the school system. Notasulga was changed to a nonracially identifiable school in the early days of desegregation pursuant to the Board's affirmative duty under *Brown* and the 1963 desegregation order to desegregate the Macon County school system. With Notasulga, but not with other schools in Macon County, the goals and aspirations of *Brown* and the 1963 desegregation order have been fulfilled.

---

**35.** *Linmark Association, Inc. v. Township of Willingboro*, 431 U.S. 85, 94–95, 97 S.Ct. 1614, 1619, 52 L.Ed.2d 155 (1977).

**36.** *Jefferson*, 372 F.2d at 847 n. 5.

**37.** *Milliken v. Bradley*, 433 U.S. at 287, 97 S.Ct. at 2761.

**38.** *Freeman v. Pitts*, ── U.S. ──, ──, 112 S.Ct. 1430, 1447, 118 L.Ed.2d 108 (1992).

For nearly 30 years, the district court has retained jurisdiction over this case to enforce the mandates of the 1963 desegregation order. The district court's enforcement powers include the full panoply of equitable powers,[39] and we review that court's use of these powers only for abuse of discretion.[40] We cannot conclude that the district court abused its discretion in exercising its equitable powers to keep open the only nonracially identifiable high school in Macon County.[41]

The Board argues that the district court's decision in this case, and now our decision in this case, is inconsistent with another decision the district court rendered the same day, approving a school board's plan to close a small school in Crenshaw County. We very recently affirmed the district court's decision in the Crenshaw County case [42] because we found the circumstances in Crenshaw County to be radically different from those in Macon County. First, the school that will be closed in Crenshaw County is critically under-enrolled, with only 188 students in grades kindergarten through twelve. This is less than a third of the enrollment at Notasulga and less than half of the minimum enrollment standard set by the state. Second, the enrollment at the Crenshaw County school has declined by more than 35% over the last 12 years. In Macon County the student population of the county as a whole has decreased, but the enrollment at Notasulga has *increased* by over 27% since 1973. Third, the Crenshaw County board presented evidence that maintaining the under-enrolled school would place a significant financial burden on the county and that the quality of educational opportunity would be significantly improved by consolidation. There is no such evidence in this

case. The busing distances and time consumed in this case are significantly greater than in the Crenshaw County case. Finally, and most importantly with respect to this case, the plan of the Crenshaw County board *promotes* integration because it will result in a consolidated school that is more integrated than either the school that will be closed or the school into which it will be merged. In marked contrast, the Board's plan in this case not only fails to promote integration, but actually has a substantial adverse effect on integration because it would eliminate the only school in the county that has been successfully integrated.

■ The Board's final argument is that the district court judge in this case, the Honorable R.E. Varner, should have recused himself because 38 years ago he served on the Macon County Board of Education, to wit, from June 12, 1950 until June 5, 1954, a time when the Board maintained a segregated school system. This argument is frivolous. Judge Varner's tenure on the Board ended less than a month after the Supreme Court decided *Brown.* He became a district court judge in 1971. The Board has offered no evidence that Judge Varner has ever declined to enforce the mandate in *Brown* or has acted discriminatorily.

## CONCLUSION

The faculty and community at Notasulga accomplished what many thought was impossible; they succeeded in establishing and maintaining a viable, successful, nonracially identifiable school in Macon County, the *only* such school in that county. The value of a school such as Notasulga in a school system such as that in Macon County cannot be underestimated. We agree

**39.** *See Swann v. Charlotte–Mecklenburg Board of Education,* 402 U.S. 1, 91 S.Ct. 1267, 28 L.Ed.2d 554 (1971).

**40.** *See Lee v. Anniston City School System,* 737 F.2d 952, 955 (11th Cir.1984).

**41.** *See Brown v. Board of Education of City of Bessemer,* 808 F.2d 1445, 1448–49 (11th Cir. 1987) ("To protect the desegregation process in Bessemer, such an order—maintaining the sta-

tus quo in respect to school district boundaries—was within the [district] court's equitable power.... [A]n injunction postponing the school-related effects of the annexation was within the power of a district court that was already supervising the desegregation efforts in the affected school district.").

**42.** *Harris v. Crenshaw County Board of Education,* 968 F.2d 1090 (11th Cir.1992).

with the district court's application of its equitable powers in this case and the court's judgment declining to approve the Board's plan is AFFIRMED.